IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

CHRISTINE TURNER, SPECIAL
ADMINISTRATOR OF THE ESTATE
OF LINDA WARNER, Deceased                                        PLAINTIFF

v.                                No. 4:18-cv-468-DPM

GARRY STEWART, M.D.;                                             DEFENDANT

## <u>THIRD MOTION IN LIMINE</u>

COMES defendant, Garry Stewart, M.D., and for his Third Motion in Limine, states:

1.      Dr. Stewart moves in limine to preclude plaintiff from eliciting medical opinions or presenting testimony, live or by deposition, on the standard of care whatsoever and on the issues of causation, and damages from Dr. Stephen Erickson that go beyond those findings included in his November 26, 2017 autopsy report of Linda Warner. Such opinions may only be given by witnesses qualified as expert witnesses and properly disclosed pursuant to the Federal Rules of Civil Procedure. *See* Fed. R. Civ. Pro. 26; Ark. Code Ann. 16-114-206.

2.      This case now only involves the care and treatment Linda Warner received from Dr. Garry Stewart while an inmate at Faulkner County Detention Center. Ms. Warner was transferred from the detention center to Baptist Hospital Conway where she passed away. Following her death, Dr. Stephen A. Erickson, Deputy Chief Medical Examiner with the State Crime Lab performed an autopsy and issued a report. *See* Autopsy Report, Exhibit A.

3.      Plaintiff's expert witness, Dr. Thomas Fowlkes, reviewed the autopsy report and commented on Dr. Erickson's findings in his expert report and during his deposition. *See* Fowlkes Report, Ex. B.

4.     Following the deposition of Dr. Fowlkes and after plaintiff's deadline for disclosing expert witnesses, the parties took the deposition of Dr. Erickson.  At his deposition, Dr. Erickson acknowledged that 1) he is not clinician, 2) the evaluation of living patients is not part of his practice, 3) he did not review records or testimony about what occurred at Faulkner County Detention Center or Ms. Warner's condition while incarcerated, and 4) he is not qualified to give opinions on clinical practice or the standard of care regarding Dr. Stewart.  *See* Ex. C, Erickson Deposition, 87:1 - 89:22.

5.     Counsel for plaintiff still questioned Dr. Erickson extensively about clinical practices and what occurred at the jail to lead him into giving opinions critical of Dr. Stewart.  *See* Ex. C, 64:12-67:2; 70:4-79:18.  Plaintiff has designated portions of Dr. Erickson's testimony and told Defendant that she intends to elicit this testimony either live or by deposition at trial.  *See* Plaintiff's Deposition Designations, Ex. D.

6.     Medical opinion as to the standard of care, causation, or alleged damages in this case may only be given by properly disclosed witnesses qualified as expert witnesses under Federal Rules of Civil Procedure and Evidence and Arkansas law governing medical malpractice actions.  *See* Fed. R. Civ. Pro. 26; Ark. Code Ann. 16-114-206.  Plaintiff did not disclose Dr. Erickson as an expert. By Dr. Erickson's own admission, he is not qualified to give opinions on the standard of care applicable to Dr. Stewart and he did not review records or testimony about what occurred at Faulkner County Detention Center when preparing his Autopsy Report.  His involvement in this case is to testify about the autopsy he performed and the report he prepared.  That is where his testimony should end.

7.     At this stage in the case, it is too late to name a new expert witness.  Dr. Erickson acknowledges he is not qualified to speak to clinical practice or the standard of care and he further

acknowledges that he did not have any information about Ms. Warner's condition at the jail or the care she received when he prepared his report. His opinions on those issues should therefore be precluded from trial.

8. A Brief in Support is being filed contemporaneously with this Motion in Limine.

WHEREFORE, this defendant prays that his motion in limine be granted and for all other proper relief.

Paul D. McNeill (79206)
Dustin R. Darst (2008141)
REECE MOORE McNEILL  PENDERGRAFT
710 Windover Road, Suite B
Jonesboro, AR 72401
telephone:     (870)394-5200
facsimile:     (870)520-6250
email:          pmcneill@rmp.law
email:          ddarst@rmp.law

By:_____

*Attorneys for Separate Defendant,*
*Garry Stewart, M.D.*

## CERTIFICATE OF SERVICE

In accordance with the Arkansas Rules of Civil Procedure, I hereby certify that, on the 26th day of February, 2021, a true and accurate copy of the above and foregoing document was provided, as indicated below, to the following attorneys of record:

_____ Regular Mail \_\_\_\_\_ Electronic Mail \_\_\_\_\_ Facsimile
\_\_**x**\_\_ **the Court's CM/ECF filing system**

| |
|---|
| Ms. Jessica Virden Mallett<br>THE LAW OFFICES OF PETER A. MILLER<br>1601 Broadway<br>Little Rock, AR 72206<br>email jvirden@petermillerlaw.com<br>facsimile: (501) 907-0661<br>*Counsel for Plaintiff* |

_____
Paul McNeill

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

CHRISTINE TURNER, SPECIAL
ADMINISTRATOR OF THE ESTATE
OF LINDA WARNER, Deceased                                             PLAINTIFF

v.                                        No. 4:18-cv-468-DPM

GARRY STEWART, M.D.;                                                  DEFENDANT

## EXHIBIT A




# State Crime Laboratory

P.O. Box 8500
3 Natural Resources Drive
Little Rock, Arkansas 72215

**Medical Examiner**
(501) 227-5936

## Medical Examiner Division

| | | | |
|---|---|---|---|
| **Case No:** | 2017-028360 / ME-1401-17 | **Date of Examination:** | November 26, 2017 |
| **Name:** | WARNER, Linda | | |
| **Age:** | 59 Years | **Sex:** | Female |
| **County:** | Faulkner | | |

---

## CONCLUSIONS

**CAUSE OF DEATH:**     Sepsis due to Purulent Peritonitis due to  Ruptured Appendicitis

**MANNER OF DEATH:**     Natural

*Stephen A. Erickson MD*

January 18, 2018

**Stephen A. Erickson, M.D.**
Deputy Chief Medical Examiner - Pathologist of Record

*Frank J. Peretti MD*

**Frank J. Peretti, M.D.**
Associate Medical Examiner - Reviewer

*Charles P. Kokes MD*

**Charles P. Kokes, M.D.**
Chief Medical Examiner - Reviewer

ASCL Official Copy - Do Not Duplicate

## EXTERNAL DESCRIPTION:

The body was that of an obese, normally developed, adult white female.  The body was clad only in a hospital gown.  No clothing or personal effects were submitted.  The body weighed 230 pounds, measured 63 inches in length, and appeared consistent with the reported age of 59 years.  The body was cold.  Rigor had waned in the extremities.  A fixed posterior pattern of lividity was present except in areas exposed to pressure.  The head was normally formed.  The scalp hair was dark red and gathered in the back in a braid.  There was red mottling of the cheeks and upper forehead.  The irides were brown.  The corneae were clear.  The sclerae showed edema and yellowing.  There were no petechiae or other abnormal changes of the scleral or conjunctival membranes.  The nose and external lips were atraumatic.  There was no inner lip trauma.  The gums were edentulous.  The ears were grossly normal.  The neck was obese, and otherwise symmetric, without notable scars or injuries.  The chest was normally formed.  Brown skin drying changes were present under the breasts.  The breasts showed no masses.  The abdomen was obese and tense.  A horizontal pelvic line scar was present.  No injuries were noted.  The external genitalia were those of a normal adult female.  The lower extremities were normally formed.  Multiple tattoos were present.  The ankles and feet showed no edema.  No distinct scars were noted.  No injuries were present.  The upper extremities were normally formed. Multiple tattoos, including of the hands, were present.  No linear wrist scar or scarred needle tracks were noted.  The posterior surface of the body showed normal development.  A linear, horizontal, well-healed scar was present on the lumbar back.  No other scars were noted.  No acute trauma was seen.  Examination of the buttocks and anus revealed brown skin excoriation of the clefts of the buttocks, with peripheral erythematous changes. No other abnormalities were seen.

## EVIDENCE OF MEDICAL ATTENTION:

A needle puncture wound was present on the left groin.  A needle puncture wound was present in the pretibial left leg.  Ink X-marks were present on the tops of the feet.

## EVIDENCE OF OLD INJURY:

None.

## EVIDENCE OF RECENT INJURY:

None.

## INTERNAL EXAMINATION

The subcutaneous fat layer measured up to 3 inches.  There was an acute purulent peritonitis process present in the abdomen.  This involved purulent adhesions of the omentum with greater than 700 mL of purulent yellow fluid in all quadrants of the abdomen, adherent to the serosal membranes of the liver, spleen, and lower pelvic structures. There was dark green discoloration in an adhesed area of the lower anterior omental fat, just to the right of midline.  The remainder of the changes will be described under the individual organ systems.  The lungs were normally inflated.  There was global left pleural adhesions and thin, purulent exudate of the right pleura.

No abnormal fluid was present in the pericardial sac.  With the above described changes, the organs were present in normal anatomic position and maintained normal relationships.  There were no internal changes of trauma to the craniocerebral, cervical, or thoracoabdominal regions.

## CARDIOVASCULAR SYSTEM:

The pericardial and epicardial surfaces were smooth, glistening, and unremarkable.  The pericardial sac contained a normal amount of clear, straw-colored fluid and there were no areas of adhesion or purulence.  The heart was normal in size, shape, and configuration.  The coronary arteries arose normally and followed a normal distribution.  Multifocal calcific, mural to greater than 70% arteriosclerotic change involved all three main coronary artery distributions, with a focal area of 80% narrowing in the left anterior descending coronary artery.  Examination of the chambers and valves revealed no abnormal chamber dilation or wall thickening. The chorda tendineae, papillary muscles, and valve leaflets were unremarkable.  Multiple sections of the ventricular myocardium revealed an area of gray-white fibrosis, measuring up to 1.5 cm in the posterior left ventricular wall.  Otherwise, no gross abnormalities were noted.  The aorta and its major branches arose normally, followed the usual course and were widely patent, free of significant atherosclerosis and other abnormality.  The vena cava and its major tributaries returned to the heart in the usual distribution and were free of thrombi.  The heart weighed 435 g.

## RESPIRATORY SYSTEM:

The left pleural adhesions released with moderate difficulty, freeing the lung.  No adhesions were present of the right pleural surfaces; although there were areas of adherent, thin tan exudate.  The pleural surfaces were smooth and glistening.  The pulmonary arteries were normally developed, patent, and without thrombus or embolus.  The upper and lower airways showed tracheal erythema, except in areas of blanching, with erythema of the bronchial mucosa. No bronchial masses were seen. Hilar and carinal lymph nodes were not enlarged.  Multiple sections of the parenchyma revealed a multifocal upper and lower lung lobe.  Areas of granular pneumonitic consolidation were much more prominent in the right lung over the left, with the remainder of the lung tissue being edematous and heavy.  The right lung weighed 935 g.  The left lung weighed 755 g.

## NECK:

Examination of the soft tissues of the neck, including strap muscles, thyroid gland, and large vessels, revealed absence of the left lobe of the thyroid gland.  No other anterior abnormalities such as hemorrhage were noted.  The hyoid bone was intact.  The laryngeal mucosa was erythematous, as well as the epiglottis and vocal cords.  The airway was patent.

## ALIMENTARY TRACT:

The alimentary tract was examined by ligating the esophagus, digitally releasing the adherent omentum from the anterior small bowel, releasing and following the large bowel, and then releasing the small bowel through its mesentery to the area of the ileocecal junction.  During this procedure, large pockets of purulent exudate were released.  Examination of the esophagus and gastroesophageal junction revealed no abnormalities.  The stomach mucosa was autolytic and erythematous.  Other than large amounts of serosal purulent exudate, following the small bowel

ASCL Official Copy - Do Not Duplicate

into the distal ileum was unremarkable, with dark green chyme present.  At the ileocecal junction, there was difficulty in releasing the large bowel from the abdominal wall which showed erythema, adherent purulent exudate, and increased areas of purulent adhesions in the lower right pelvic area.  Multiple sections appeared to show a largely dilated necrotic appendix, with marked amount of green staining in the area of the right anterior pelvic bowl.  After this point, following the large bowel, into its ascending transverse descending sigmoid and rectal components, revealed no distinct abnormalities.

## LIVER AND BILIARY SYSTEM:

The hepatic capsule was erythematous with adherent exudate, and intact.  The underlying parenchyma was light tan-yellow-brown, with no mass lesions.  The gallbladder was tense with tenacious, thick bile.  The mucosa was normal.  The extrahepatic biliary tree was grossly normal. The liver weighed 1900 g.

## PANCREAS:

The pancreas was examined in situ and showed no evidence of calcification, hemorrhage, glandular purulence, or other abnormality.

## GENITOURINARY SYSTEM:

The renal capsules stripped normally from the underlying granular, pale, softened cortical surfaces.  The cortical widths were normal and there was sharp delineation from the medullary pyramids.  The calyces, pelves, and ureters were unremarkable.  The urinary bladder was devoid of urine.  The mucosa was erythematous.  The vagina was unremarkable.  Examination of the cervix, uterus, fallopian tubes, and ovaries showed that the fallopian tubes were apparently remotely ligated.  There was adherent purulent exudate on the serosal surfaces.  The ovaries appeared atrophic and unremarkable.  The uterine mucosa was thin, tan, and unremarkable.  The right kidney weighed 240 g.  The left kidney weighed 245 g.

## IMMUNOLOGIC SYSTEM:

The spleen had a smooth, intact capsule covering softened, congested parenchyma.  The white pulp was not prominent.  No lymphadenopathy was noted.  The spleen weighed 300 g.

## ENDOCRINE SYSTEM:

The pituitary gland was unremarkable.  The right adrenal gland showed no hemorrhage.  In the difficult dissection of the transverse and descending large bowel of the left adrenal gland was not found.  Examination of the thyroid gland revealed a normal right thyroid lobe and isthmus with prepared congenital absence of the left thyroid lobe.  The right thyroid lobe showed focal nodules.

## MUSCULOSKELETAL SYSTEM:

Muscles were softened, red-brown and within normal development.  No palpable or grossly obvious bone or joint abnormalities were noted.  The cervical, thoracic, and lumbar spine showed no obvious old fractures or other abnormalities.

ASCL Official Copy - Do Not Duplicate

## CENTRAL NERVOUS SYSTEM:

The scalp showed no edema or hemorrhage.  The calvarium and base of the skull showed no fractures.  The dura mater and falx cerebri were intact.  There was no epidural, subdural, or subarachnoid hemorrhage present.  The leptomeninges were thin, delicate, and clear.  The cerebral hemispheres were symmetric.  The cranial nerves and circle of Willis were normal.  Sections through the cerebral hemispheres, brain stem, and cerebellum revealed no focal lesions or herniation.  The spinal cord was not examined.  The brain weighed 1140 g.

## HISTOLOGY:

Lungs:  Multifocal areas of bronchopneumonia present in all four lung lobes examined characterized by sheets of polymorphonuclear leukocytes, degenerating cells, and proteinaceous material present into multifocal areas of the alveolar airways.  In some areas there is necrosis of the alveolar walls leading to micro abscess formation.  No polarizable intravascular material is noted.  The small airways show, in areas, a necrotizing acute bronchiolitis.  One of the small vessels appears to show possible septic emboli with what appears to be fat cells.

Kidneys:  Cortical scarring with multifocal sclerotic glomeruli and scant chronic inflammation in the interstitium.  The tubules show extensive autolytic change.  In some areas the tubule epithelium is flattened.

Heart:  An area of extensive myocardial fibrosis with entrapped hypertrophic myocardiocytes.  Away from this area there are mild myocyte hypertrophic changes.  There is no acute or chronic inflammatory infiltrate, active necrosis, or hemorrhage.

Appendix and surrounding fat:  An acute and chronic inflammatory infiltrate extends into the fatty tissue.  Acute exudate is present on the surface.  The appendix shows extensive chronic inflammatory infiltrate to the serosal musculature, with an acute exudate on the surface of the serosa.

## RADIOLOGY:

None.

## IDENTIFICATION:

By the investigating agency.

## EVIDENCE:

Fingerprints, DNA matrix card, organ biopsies, and soft tissue biopsies involving purulent exudate were retained.

## SPECIMENS:

Heart blood and vitreous humor were retained.  No toxicological screening ordered, due to prolonged hospitalization.

                                    ASCL Official Copy - Do Not Duplicate

**PHOTOGRAPHS:**

Standard external photos.  Internal photographs of acute peritonitis.

**WITNESSES:**

None.

ASCL Official Copy - Do Not Duplicate

# FINDINGS

I.     Acute purulent peritonitis:
    A.  Dilated necrotic appendix.
    B.  700 mL, liquid purulent fluid, peritoneum.
    C.  Multiple areas of purulent adhesion throughout abdominal omentum, small bowel, and ileocecal area.
    D.  Multifocal bronchopneumonia.
    E.  Clinical history of acute renal failure.

II.    Three-vessel moderate to focally severe coronary artery arteriosclerosis:
    A.  Focal area of left ventricular healed myocardial fibrosis.

III.   Obesity.

IV.    Left pleural adhesions.

## OPINION:

In consideration of the circumstances of death and after autopsy of the body, it is our opinion that Linda Warner, a 59-year-old, white female, died of sepsis due to purulent peritonitis due to ruptured appendicitis.   The agencies responsible for the investigation of her death were the Faulkner County Sheriff's Office and Coroner's Office.   They reported that she was in custody at the Faulkner County Jail, when she was found unresponsive in her bunk.   She was aggressively resuscitated and transported to a local hospital, where her condition was profoundly unstable. Her diagnosis was anoxic injury and sepsis.   She died approximately 24 hours after admission to the hospital.

At autopsy, an acute purulent peritonitis was present with manifestations of sepsis affecting the body organs, including bronchopneumonia of the lungs.   The origin of the peritonitis appeared to be from a ruptured appendix.

## MANNER OF DEATH:        Natural

ASCL Official Copy - Do Not Duplicate

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

CHRISTINE TURNER, SPECIAL
ADMINISTRATOR OF THE ESTATE
OF LINDA WARNER, Deceased                                    PLAINTIFF

v.                          No. 4:18-cv-468-DPM

GARRY STEWART, M.D.;                                         DEFENDANT

| EXHIBIT B |

ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2018-Jun-01 20:37:10
23CV-18-846
C20D02 : 42 Pages

Thomas D. Fowlkes, M.D. submits the following Expert Report on behalf of the Estate of Ms. Linda Warner.

I have been the medical director of a detention facility for the past 19+ years. I am board certified in emergency medicine and addiction medicine and I am a Certified Correctional Health Professional-Physician (CCHP-P). I am familiar with the standard of care in a county detention facility.

**Scope of report:**

(I.) The appropriateness of the medical care provided Ms. Linda Warner while she was incarcerated at the Faulkner County Arkansas Detention Center (FCDC) in October and November 2017 (II.) Whether Ms. Warner's past medical history, on-going medical conditions and autopsy findings influence those opinions (III.) Whether the Policies & Procedures in place regarding medical care at the FCDC are reasonable and appropriate.

My opinions are to be limited to those that I can offer to a reasonable degree of medical probability or likelihood.

**Factual Summary:**

1. Ms. Linda Warner was a 59 year-old female with a past medical history including:

    a. Insulin requiring Type II Diabetes Mellitus (DM) with poor control

    b. Hypertension

PLAINTIFF'S EXHIBIT
2

c. Hyperlipidemia

d. Generalized osteoarthritis of multiple joints

e. Asthma

f. Chronic pain- prior back surgery in 1999

g. Depression

h. Generalized anxiety disorder

i. Candidiasis of skin

2.     Ms. Warner's primary care physician was Dr. James Fulmer at Greenbrier Family Medicine. She saw Dr. Fulmer at least five times between January 1, 2017 and October 30, 2017 when she was incarcerated.

3.     Ms. Warner's prescribed medications at the time of her incarceration included:

a. Tresiba Flex U-200 pen (Insulin) 80 units each evening (qhs)

b. Breo Ellipta inhaler

c. Albuterol inhaler

d. Lisinopril 10 mg by mouth (po) every day (qd)

e. Crestor 20 mg po qd

f. Topamax 100 mg po twice a day (bid)

g. Diazepam 2mg po three times a day (tid)

h. Fluoxitene (Prozac) 40 mg po every morning (qam)

i. Duloxetine ER (Cymbalta) 60 mg po qd

j. Omeprazole ER 40 mg po qd

k. Mybetriq ER 50 mg po qd

l. Naprosyn 500 mg po bid

m. Tramadol 50 mg po every 8 hours as needed (prn)

n. Maxalt 10 mg po prn

o. Fluconazole 150 mg tabs

p. Nystatin Cream

q. Lyrica 150 mg po bid

r. Melatonin 3 mg po qhs

4.     Ms. Warner had been incarcerated at the FCDC several times previously. Her medical conditions were known to the FCDC medical staff and she had received treatment for her chronic medical conditions on prior incarcerations.

5.     During a 2016 incarceration Ms. Warner expressed her concern with the charges for health care and medications at FCDC and someone brought some of her home medications to FCDC. She was seen by Dr. Garry Stewart at least twice during that incarceration and he requested records from her doctor and prescribed medications.

6.     Ms. Warner's penultimate incarceration at FCDC was from 7/26/2017 through 8/7/2017 on Violation of a Protection Order. During that incarceration:

a. The day after intake Ms. Warner filled out a paper Medical Request Form and the next day Ms. Warner was seen by Linda Grant, LPN. Nurse Grant noted her past medical problems, noted that she "falls all the time" and "uses potty chair & knee brace & walker." Her plan was: "information release to booking, blood sugar log initiated, blood pressure log initiated and to see jail MD first available." (FCDC Med 000065)

b. The FCDC staff sent requests for records of Ms. Warner's prior treatment to Conway Regional Cardiovascular Clinic, Baker Eye Institute, CHI-St. Vincent's Heart Clinic, Harps Pharmacy in Greenbrier, and Greenbrier Family Medicine. Records were received and were contained in Ms. Warner's FCDC medical record at the time of her last incarceration.

c.  A blood glucose log was begun. Ms. Warner's glucose was checked for five days and then stopped.

d.  A progress note indicated that Ms. Warner was to see Dr. Stewart on 8/10/2017 for high blood pressure, DM, weakness and falling. However, Ms. Warner was released on 8/7/2017.

7.  There is also contained in the FCDC administrative file an Affidavit To Dismiss No Contact Order signed by Jason Blake on 9/20/2017 and an Order Dismissing No Contact Order dated that same day from the Ninth District Court of Arkansas.

4

8.     Ms. Warner was booked into FCDC on 10/30/2017 at 20:47 on Violation of a Protection Order. A Medical Screening was completed on 10/30/2017 by Correctional Officer (CO) Ellis. It was reviewed on 10/31/2017 by Leanne Dixon, Medical Assistant (MA) and she signed the space for nurse signature. The following information is recorded:

a. Visual Observations by the CO for immediate medical problems are all answered "No."

b. Last TB skin test and List all allergies are both answered "Not applicable" ("n/a")

c. Are you under a doctor's care? Answer = No

d. Have you been hospitalized, Do you require special diet, Are you currently taking any medications, Do you have your medications with you? All Answered = "No"

e. The remainder of the questions are answered negatively except: Do you have any physical handicaps? and Have you ever been treated for....Diabetes? are both answered "Yes."

f. Ms. Warner signed the form.

g. There is a notation of: "Blood sugar log times 5 days" at the bottom of the form.

9.     MA Dixon made a notation of medical items on 10/31/2017 about three inmates which included that Ms. Warner was housed in B-12 and was to have her blood sugar checked twice a day for 5 days. I do not see recorded that MA Dixon checked Ms. Warner's blood sugar upon intake.

10.     The Blood Sugar Test Log begun on 10/31/2017 has three notations of refusal by Ms. Warner and then a notation that the log was discontinued on 11/2/2017 at detainee's request.

11.     On 11/2/2017 a kiosk medical request by user Linda Warner reads: "no more sugar testing while here." A response that same day by Karen Grant, LPN was "duly noted."

(N.B. It appears that written communication from Ms. Warner has significant difficulties with spelling, grammar and syntax. Although in general I try to summarize statements, clarify abbreviations, and correct misspellings in a timeline summary, I have recorded her written communication exactly as written to avoid misinterpreting her message.)

12.     On 11/5/2017 a kiosk medical request reads: "i have a tummy problem and pads are not working so can i get something that i can wear that will last if i have an accident please an thank you." Monte Munyan, LPN replied the next day: "Please be more specific, is this a urinary, menstrual or bowel issue?"

13.   On 11/6/2017 a kiosk medical request reads: "i need cause wet all over myself use more then one day" and a response by Nurse Munyan that same date reads: "Pads are supplied as needed."

14.   On 11/07/2017 at 20:58 a kiosk medical request reads: "cant i have someone bring breif need wear because icant move go thrw every thing this no joke" The next morning Nurse Grant replied: "have faxed your information to the MD an am awaiting a reply."

15.   Nurse Grant wrote a note which relayed to Dr. Stewart that Ms. Warner was complaining of bladder leakage every time she moves and requested adult briefs. She advised officers of the need to replace feminine napkins frequently and she inquired if there were other orders. Dr. Garry Stewart replied via fax on the evening of 11/08/2017 "No."

16.   On 11/12/2017 Ms. Warner wrote in a kiosk medical request: "need my wheel potty chair leg brace my alwalkr and all my med my dr fulmer they dont understand called 50o 4737346" Nurse Grant responded the next day: "The chair is not allowed at the facility. and what medication do you refer to?"

17.   On 11/14/2017 at 07:20 Ms. Warner wrote in a kiosk medical request: "i would like to see the nurse today for my meds, depends/panties, and a two piece suit. thank you for your help in this matter." There is no response that day from the medical staff to that request.

18.   On 11/14/2017 at 21:15 CO Michelle Maher wrote in a narrative report:

11/14/2017
2115 Hours (9:15pm)
Female Housing (H39)
Re: Detainee Linda Warner

Officer Michelle Maher's Statement;

On the about date and approximate time, it was brought to my attention that Detainee Linda Warner couldn't walk. I knew better than this so I proceeded to go into female housing (H39) to check on said detainee. Once I made it clear that no one was going to pick her up or call 911, which is a statement that she was making, she decided that she could walk. By this time we had already disposed of one more mattress (totaling 3) due to urine saturation but at that time she hadn't wet it again. As she was walking around the end of the bunk, I noticed that she got slower and slower. She also bent over a little bit lower with her hands on her knees, which she did. She stood there like for about a minute or two, she wobbled (intentionally) a little, and she fell on her bottom. I tried to assist her in getting up, without hurting her or myself, to no avail. She actually pulled against me and pulled her hand out of mine when I tried to assist her up from the floor. At this time Cpl. Dallas came in to assist me with Detainee Warner. After we got the other detainees calmed down and back to their bunks, so we could actually focus on what was going on, we realized what Detainee Warner was doing. She was convinced that if she didn't get up, we would call 911 and an ambulance would come get her and take her to the hospital and she would get OR'd. Cpl. Dallas and I made sure that she was fully aware that this was not the case so after about an hour she decided to try to get up instead of just rolling around on the floor.

Officer Michelle Maher #373

19.   On 11/15/2017 at 06:12 Ms. Warner wrote in another kiosk request: "i would like to see the doctor please. i need my meds. im in pain and feel like the fibromyalgia is flaring up due to no meds. also my sugar is pretty high. i have a rash on my bottom, front, and breast. i also needs depends. is there any way for a 2 piece suit...thank you for your consideration in this matter." At 13:35 on 11/15/2017 Nurse Grant responded: "seen in clinic 11/15/2017 - miconazole nitrate cream - apply a thin layer to groin and under abdominal fold after showering X 1 daily. Barrier cream- apply thin layer to buttocks after showering daily - disposable briefs you may have up to 4 daily - an information release will be sent to housing please fill it out and return it to the medical department - to see jail MD 1st available appointment - your blood sugar log will start @ 3:30 pm today - thank you." (Ms. Warner also wrote via kiosk on the morning of 11/15/2017: "would like

8

to speak to Lt. Huffman." Nurse Grant replied: "put this on a regular grievance - not a medical one please. Thank you.")

20.    Nurse Grant documented in a progress note the visit with Ms. Warner on 11/15/2017. She noted the chief complaints of bladder incontinence, elevated blood sugar and rash to groin and buttocks. In addition to describing the rash, Nurse Grant also noted on assessment: "Gait was unsteady and her footing was unsure." Nurse Grant also made a comment: "Detainee had previous requested via kiosk that she no longer want to be woken up for blood sugar testing while she was ....(?word). She agreed to re-start blood sugar log." Nurse Grant did not record any vital signs or glucose reading. There was a charge of $15 for the encounter. (FCDC Med000016)

21.    The order for the two creams was counter-signed by Dr. Stewart. No insulin or other medications were begun after this encounter on 11/15/2017.

22.    Another Blood Sugar Test Log was implemented on 11/15/2017. The first two entries in the afternoon of 11/15/17 and the morning of 11/16/2017 have no results and indicate the inmate refused the tests. On the afternoon of 11/16/2017 Ms. Warner's glucose was checked for the first time during this incarceration and was found to be 442. No insulin or other medications were begun. No treatment was provided.

23.   The next scheduled glucose check on the morning of 11/17/17 is listed as refused by Ms. Warner. On the afternoon of 11/17/2017 her glucose was 328. Again, no insulin or other medications were given.

24.   On the morning of 11/18/2017 the glucose log records: "2 readings 'Hi'" (N.B. On many glucose meters this indicates a blood glucose of greater than 600.)

25.   On 11/18/2017 at 09:02 CO Teresa Coleman wrote in a narrative report that when she took Ms. Warner's blood sugar "she was sitting on a bench because she seemed a little unstable. She sat for about 20-30 minutes." A short time later Ms. Warner fell near the bench. CO's Maria Hill and Taylor Haney took Ms. Warner's blood pressure (BP) and found it normal at 129/76 but she was tachycardic with a heart rate (HR) of 125. She then writes: "They assisted her into her room and she reported that she was ok, she just lost her balance." There is no indication in the record that:

a. any insulin or other treatment was provided for the out of control glucose.

b. there was any evaluation of the tachycardia.

c. the medical staff was notified, had any contact with Ms. Warner or provided any evaluation or treatment on this day.

26.   At 15:41 on 11/18/2017 Ms. Warner's glucose was again checked by CO Coleman and found to be 523. Again, no treatment or evaluation was provided.

27. On 11/19/2017 and 11/20/2017 Ms. Warner's glucose was checked 3 times with readings of 407, 342 and 322. No test or refusal is documented on the evening of 11/20/2017. In an Interoffice Memo dated 12/15/2017 Nurse Grant reported that she received a call on the morning of 11/19/2107 from a CO reporting a glucose of 408 for which she instructed that Ms. Warner be given 8 units of regular insulin. I did not find evidence of that insulin administration being done or documented. No other insulin or other treatment/evaluation was performed on any of these occasions. (N.B. Nurses Grant and Munyan later made statements which indicated that there were no more calls received about Ms. Warner's glucose except as noted herein.)

28. On 11/20/2017 there is an Interoffice Memo by CO Marissa Parks in which she documented that as she was attempting to get Ms. Warner up from the floor of the shower Sergeant Bobbie Spivey "came in and advised that Detainee Warner could get up by herself." In response "Corporal Pope and myself then exist (sic) the shower room and went back to booking." She submitted this memo to Cpl. Pope, Sergeant Calene Scott and Lt. Flowers "for your review." There is no indication that any action was taken in response.

29. Corporal Pope also documented in an Interoffice Memo to Sgt. Scott and Lt. Flowers on 11/20/2017 that "Sergeant Bobbie Spivey then arrived in the cell and told us not to help Detainee Warner up."

30. On 11/21/2017 at 10:10 MA Dixon documented in a Medical Department note that Ms. Warner was seen in clinic that morning "by the jail MD. She was very uncooperative and would not stand up when the doctor asked her to. Dr. Stewart asked Ms. Warner multiple times what her medical complaints were. Ms. Warner only stated her incontinence if her bowel and bladder....." (FCDC Med000003)

31. A Progress Note written on 11/21/2017 and signed by Dr. Garry Stewart documented:

a. Chief complaints of incontinence, increase blood sugar, rash to groin and buttocks.

b. It appears that there is a DAP note. I believe the handwriting says:

Data -> chronic

Assessment -> Obesity and Personality Disorder

Plan -> Not Compliant

c. The physical exam section has a comment: "Patient acts as if she can't walk or help self. Witnessed by staff to be _____ (N.B. can't read word-possibly dancing?) Acting out."

d. The Physical Exam section has every organ system (including cardiac, abdomen and skin) marked as Within Normal Limits.

e. Dr. Stewart notes Ms. Warner's history of Diabetes, Generalized Anxiety Disorder, Low Back Pain, Syncope, and three more which I am unable to decipher.

f. His Assessment/Plan is that Ms. Warner has Axis II (i.e. Personality Disorder), DM for which he plans to start 70/30 insulin and a Psychiatric Disorder for which he plans Prozac.

g. There are some additional comments I cannot read. His third order is "Encourage self help." He noted Dr. Fulmer's number and wrote: "I have called him to discuss her. Waiting for his response."

h. There is no indication that Ms. Warner's vital signs or blood glucose were measured during this encounter.

32.   In an Interoffice Memo written on 11/29/2017 CO Christopher Lisembey-Hall described the events of the morning of 11/21/2017. CO Lisembey-Hall wrote that when Ms. Warner was going to Doctor Call "It took her roughly 20 minutes to get up out of bed and get ready." She was described as "huffing" while waiting on a bench.

33.   There is documentation of an incident which occurred after Ms. Warner had been in the medical clinic on the morning of 11/21/2017. Documentation of this incident consists of an Interoffice Memo written by CO Marissa Parks (N.B. one date on this Memo is incorrectly recorded as 11/20/2017), a Medical Department Note written by MA Dixon on 11/21/2017 (FCDC Med000001), the Blood Sugar

Test Log (FCDC Med 000010) and Insulin Log (FCDC Med000006). These records indicate that:

a. Ms. Warner was found on the floor. CO's assisted her off the floor and back onto a bench in H-32.

b. "On 11/21/17 at approximately 10:30 a.m. Sgt. Spivey came to the clinic, where Dr. Stewart, Nurse Munyan and I were at, and stated Ms. Warner was on the floor. There was no further action taken by myself at this time. At approximately 11 a.m., Doctor call was finished. Dr. Stewart and Nurse Munyan left the facility." MA Dixon went to the female housing area and found Ms. Warner sitting on the floor. When Ms. Warner did not speak to MA Dixon she placed an ammonia capsule under Ms. Warner's nose "and she held her breath so I proceeded with her vital signs." BP=122/84, Pulse= 141, Pulse Ox=98% MA Dixon relayed these vital signs to Nurse Munyan and Dr. Stewart whose only order was a fingerstick glucose. "Ms. Warner was unable to stick her own finger." Fingerstick glucose result was 502 which was relayed to Dr. Stewart. He ordered 12 units of Regular insulin which MA Dixon administered. There were no other orders documented. (FCDC Med000001 & 000002)

c. "Medical was called and the nurse assistant came and took Detainee Warner blood pressure. She was unable to get a reading in the right arm so she move it to the left arm and got a reading. She then checked her pulse oxygen and

14

took her blood sugar. Once the blood sugar was checked it was discovered that her sugar was too high. Nurse assistant called for nurse Munyan whom stated for nurse assistant to give her a shot of insulin. Once this was done, ..."

d. The glucose reading was recorded as being 502 at 11:00 on 11/21/2017. The Blood Sugar testing log shows that Ms. Warner's glucose had not been tested since 11/20/2017 at 07:31 hours when it was 322 until this reading. Ms. Warner was noted to be unable to sign the log at this time. MA Dixon recorded giving 12 units of Regular insulin at 11:10. At this time Ms. Warner was documented to be sweating.

34. In an Interoffice Memo written on 11/21/2017 Corporal Anna Pope wrote: "When Detainee Linda Warner was being taken back to Female Housing she collapsed in the hallway by H-20." She continued: "Once on the bench Detainee Warner wasn't acting like she was all with us." Then: "Once medical arrived they tried to get a blood pressure and couldn't get anything. She then moved to the other arm and was able to get a reading in the other arm."

35. In an Interoffice Memo written 11/21/2017 Sgt. Calene Scott described the events of that morning after Ms. Warner went to Sick Call. "Upon arrival we see someone laying down on the floor. I ask what was the problem and Corporal Collins stated that she was kicked out the nurses station by Dr. Steward (sic). I ask why and she stated that the doctor said she wasn't listening."

15

36. CO Lisembey-Hall describes the events later in the day on 11/21/2017 in his

Interoffice Memo dated 11/29/2017:

then Layed her mattress in the floor so she could sleep on it. Around 1850 The other shift was Coming in, I looked at Officer Jernigan and said "Some stuff went down today, would you go in Ms. Warners cell with me to make sure she is okay beacuse she has been sitting there laying on her floor and has not moved." Officer Jernigan then replied "Yes" The two if us went in to Ms Warners cell and Tried talking to her. She was Non Compliant. We established a yes or no talking system with her hand momevements. We asked her if she wanted to be on her mat and back on her bunk. Ms. Warner Said Yes to Both. So Officer Jernigan Called For some more help. Officer Meyers then came and and called for Officer Whitcomb. Once Officer Whitcomb got into the mix the situation got a little Hostile. He kept demanding that Ms. Warner Listen and comply Becasue "He was not doing this again" After a few attempts of trying to tell her what to do and lifting her up by himself without wanting anyone elses help he called for Corporal Wright Pepper Spray. Telling Ms. Warner "If you dont get up, Imma spray you Linda" Corporal Wright Came around the corner While putting on her gloves and asked what was going on. Officer Whitcomb Told her and She listened. She then drew her peper SprayAnd started Shaking it and warming it up with her hands by rubbing it in her hands.Corporal Wright told Ms. Warner to Get up and stop playing. She told her this amout 2 or 3 times while also saying if you dont ill spray you. Ms. Warner again being Non-Verbal Did not listen nor comply. At that time Corporal wright got but only a few inches from her face (Maybe 3-4 inches) and shot out a small stream onto the right side of her face. The Spray didnt Affect her. After that it was a blur as We got our things and left. That was all the involment i had with Detainee Linda Warner. *Officer Cu-ter Jeremney Hall* 3lac

37. CO Malik Clemons described the events of 11/21/2017 in an Interoffice

Memo dated that same day:

On the above date and time we were called from booking back to female housing. Upon arrival I seen detainee warner laying on the hallway floor. Sgt Spivey and Cpl. Collins informed us of the situation saying the woman wouldn't get up and had been peeing all over herself. Ofc Kilpatrick, Ofc Parks, Cpl Collins and Cpl Pope helped walk her from the hallway floor to the bench inside the cell. I did not touch her at this time. We went back to our station until a second call for assistance was made. When I arrived this time I seen detainee warner was hunched over in the day room. Sgt Spivey, Cpl Collins and Ofc Kilpatrick entered the cell to try to assist warner into her room. We tried to get her to respond and she would not so Ofc Kilpatrick popped an ammonia tab in front of her face Sgt Spivey told him to put it in her nose. She didn't respond that is when he popped another but that still did little while she was in her current state. I asked Sgt Spivey if we could put a mat or go get a wheelchair instead of pulling on her body. She informed me it was against policy and we were not allowed so we proceeded to move her. Once we got her in her room we put her mat under her and left the room. I'm submitting this for your review.

38. CO Thad Kilpatrick described the 11/21/2017 this way in an Interoffice

Memo dated the same day:

16

On the above date Officer Clemons and myself was called back to female housing because a detainee had fallen and they needed help getting her back to the cell. Once I got back there Corporal Collins and Sergeant Spivey was needing help with Detainee Warner, Linda. She was laying on the ground in the day room. Corporal Collins, Officer Clemons and myself asked what was wrong with her, and asked if she could get up and walk all she did was lay there with her h eyes open and just moaned. I asked Corporal Collins what was wrong with her and Corporal Collins advised me that she was faking it and just wanted to go home. I got two ammonia tablets and cracked them under her nose but it didn't do anything. She just held her breath. At this time I asked if we could lay her on a mat or get a wheelchair to get her in. Sergeant Spivey told us that we couldn't lay her on a mat. We tried to pick her up, but she was died weight. Sergeant Spivey said to hurry up because if the sheriff sees her laying in the day room that we were all going to get in trouble and that we just need to drag her to the cell. Once we got her into the cell we laid her on the mat. And that is when Sergeant Spivey told us that she's fine and we need to leave the cell. I'm submitting this for your review.

Kilpatrick #379

39.     Corporal Anita Wright made a detailed description of her actions on the

evening of 11/21/2017 and morning of 11/22/2017 regarding Ms. Warner in an

Interoffice Memo dated 11/29/2017. The report documents:

On November 21, 2017 as I, Corporal Anita Wright, came into Housing around 1845 Hours, I was advised by Sergeant Bobbie Spivey that Detainee Linda Warner had seen Nurse Monte Munyan earlier that day and was uncooperative with him. A few moments later, I was advised by Corporal Tyroneisha Collins that Detainee Linda Warner had been refusing to have her blood sugar tested and if she continued to refuse, that we were to contact Nurse Munyan and he would come in and check it personally.

At approximately 1855 Hours, I was asked to go to Female Housing Cell H32, Pod H37 and assist officers to get Detainee Warner out of the floor and onto her rack. I entered the pod with Officer Eric Whitcomb. Officers Kevin Myers, Christopher Hall, and Taneisha Jernigan were already in the pod and were standing around Detainee Warner who was sitting upright in the floor in the middle of the pod. I approached Detainee Warner and as I gave her a lawful order to get up and get on her rack, Officer Whitcomb bent down and buttoned Detainee Warner's jumpsuit because her breasts were exposed. Detainee Warner's head was hanging down towards her chest and she did not respond to me. I ordered Detainee Warner several times to get up and go to her rack. Detainee Warner did not respond at any time. I pulled my pepper spray out of it's holster, bent down towards Detainee Warner and told her if she didn't get up off the floor and get on her rack, that I was going to pepper spray her. Detainee Warner did not respond. I shook the pepper spray can several times in front of her face and Detainee Warner still did not move. I attempted to pepper spray Detainee Warner, but my OC spray canister malfunctioned and only a few drops of pepper spray drizzled out and landed on the front of Detainee Warner's jumpsuit. I told the officers who were there with me to just let Detainee Warner stay on the floor if that was what she wanted to do. I placed my pepper spray back in the holster and we exited the pod, leaving Detainee Warner sitting on the floor. Sergeant Spivey reminded me then that I couldn't spray Detainee Warner because she was not a danger to herself or others.

A little while later, I was sitting on the podium in Female Housing and Detainee Vennessa Lyons came to the H32 gate and asked if she could speak with me. I opened the gate and Detainee Lyons approached the podium. Detainee Lyons said she and some other detainees had managed to get Detainee Warner off the floor and onto a rack. Detainee Lyons advised me that Detainee Warner and wet herself and needed a clean jumpsuit and disposable brief. I advised Detainee Lyons that Detainee Warner would need to come to the gate when I was passing 2200 meds to get her brief and sign for it.

At approximately 2155 Hours, I completed 2200 med pass in Female Housing and Detainee Warner had not come out of her pod to get a brief and clean jumpsuit. I continued to Male Housing to pass 2200 meds.

On the morning of November 22, 2017, Detainee Warner refused to come out of the pod and get her breakfast tray. When A-Shift came in at shift change that morning, I informed Officer Andrea Varhalla of the situation with Detainee Warner and passed on the instructions to contact Nurse Munyan to come take Detainee Warner's blood sugar if she refused to take it. I had not physically laid eyes on Detainee Warner since I had exited her pod the evening before around 1905 Hours.

I am submitting this for your review.

Corporal Anita Wright #357          357

40.    On 11/21/2017 at 5:05 p.m. Nurse Munyan reported in a text message to Captain Riedmueller: "I just got done speaking with Dr. Stewart. We had seen Linda Warner this morning and she is even worse than she was previously, as reported by Corporal Collins now. We found that her blood sugar is very high so the doctor put her on insulin twice a day but she is refusing to get up out of her bed and come to the gate to have it checked so the doctor said leave it alone tonight and I will come in in the morning and check her blood sugar myself but he wants me to

call him and let him know if we need to do a medical o.r. (N.B. own recognizance) and get her out because she is a liability."

41.    On 11/22/2017 at 08:41 CO Teresa Coleman documented:

On the above date and approximate time, Nurse Monte Muyan called to inquire about Detainee Linda Warner. I reported that I had called into her room, during the time that vitals were being taken, to see if she would step out to have her blood sugar taken. I heard no response other than her moaning. She never came out of her room. Nurse Munyan said that he was going to come to the facility to check on her. This concludes my involved in this situation.

Officer Teresa Coleman #372

42.    CO Andrea Varhalla documented the events of the morning of 11/22/2017 in a Narrative Report. She reported:

a. At approximately 08:41 Nurse Munyan contacted FCDC to inquire about Ms. Warner. When told by CO Coleman that Ms. Warner was "refusing to have her blood sugar taken," Nurse Munyan stated that he would come to FCDC.

b. Nurse Munyan arrived approximately one and one-half hours later at 10:10. At approximately 10:30 Ms. Warner's oxygen saturation was 75% (N.B. normal = >90%) and "no BP due to the machine reading error."

c. Approximately 20 minutes later Nurse Munyan got permission from Dr. Stewart to send Ms. Warner to an Emergency Department (ED) and EMS was called.

43.    There is a typewritten Nurses Note dated 11/22/2017 and a typewritten Phone Record of conversations regarding Linda Warner on 11/21/2017 and

11/22/2017 from on call log. Although I cannot read the signature, it appears consistent with other known actions of Nurse Munyan. These notes include:

a. Nurse Munyan noted a foul odor consistent with bowel and bladder incontinence on entering Ms. Warner's cell.

b. He also noted immediately on entering the cell "she was moaning with every exhale and that with every inhale there was a wet sound in her breathing. She opened her eyes to verbal initially but did not seemed focused" and made no further responses.

c. Nurse Munyan obtained a HR of 136 and oxygen saturation of 75-78%

d. Nurse Munyan did not call 911 upon learning these findings, but rather texted Dr. Stewart and later called him at 10:46 to get "the order to send her out to Baptist ER." He then left Ms. Warner and "went outside to guide the ambulance crew to the cell."

44.    MEMS was dispatched at 10:52 and arrived at the patient at 10:58. Pertinent details of their findings include:

a. EMS personnel found the patient in cardiac arrest (pulseless and apneic).

b. They began CPR and found the initial rhythm to be asystole.

c. "Jail staff reports patient has had a decreased level of consciousness since last evening but patient had been responding to them. Staff reports just prior

(approx. 15 minutes) to calling, patient would only open her eyes on command but no verbal response."

d. Ms. Warner's glucose by MEMS was greater than 600.

e. After performing Advanced Life Support (ALS) Ms. Warner was resuscitated and was transported to Baptist Health-Conway (BHMC-Conway).

45. Ms. Warner was released on her own recognizance by FCDC prior to transport by MEMS.

46. Ms. Warner arrived at BHMC-Conway at 11:43 a.m. on 11/22/2017. She was pronounced deceased on 11/23/2017 at 08:27. Information about her hospitalization included:

a. Ms. Warner was found to be in "Severe Sepsis with Septic Shock," Diabetic Ketoacidosis (DKA), Upper Gastrointestinal Hemorrhage, Acute Kidney Failure, and Rhabdomyolysis.

b. Ms. Warner's hospital course continued downhill despite maximal medical management and she died the next morning.

47. An autopsy was performed. Findings included:

a. The cause of death was ruled Sepsis due to Purulent Peritonitis due to Ruptured Appendicitis by Dr. Stephen Erickson, the Deputy Chief Medical Examiner.

b. There was jaundice of the sclera.

21

c. The abdomen was obese and tense.

d. In the abdomen was an acute purulent peritonitis process with "purulent adhesions of the omentum with greater than 700 mL of purulent yellow fluid in all quadrants of the abdomen."

e. There was coronary atherosclerosis involving all three coronary arteries "with a focal area of 80% narrowing in the left anterior descending coronary artery."

f. There was a "largely dilated necrotic appendix, with marked amount of green staining in the area of the right anterior pelvic bowl."

g. Microscopic slide findings included:

i. "Lungs: Multifocal areas of bronchopneumonia present in all four lung lobes"

ii. "Micro abscess formation" in the lungs

iii. "Possible septic emboli with what appears to be fat cells"

iv. Area of appendix shows: "An acute and chronic inflammatory infiltrate"

v. "The appendix shows extensive chronic inflammatory infiltrate..."

Pertinent Items From Supplemental Information That I Also Reviewed:

48.    Inmate Statements are consistent with the primary records in documenting the progressive deterioration in Ms. Warner's condition in the week or so before

her death as well as in confirming the belief held by the staff that Ms. Warner was faking. The statements by the inmates are essentially consistent with the documentation by the officers themselves of their actions.

49. While incarcerated in November 2017 Ms. Warner wrote a letter to her daughter, Chris. It appears to be originally dated 11/1/17. However, it also appears to be written in several parts and I am unsure when it was completed or mailed. The pertinent parts regarding her medical condition are:

a. "Really bad off no med and nothing Have dr. apt nov 10th i need go Keep calling about my apt. My left is really bad going down hill every day i can hardly walk have have that problem wetting all over. There ok they understan for folk do cause had no med since Oct. 29th. I'm bad off no lie."

b. Another note says: "Chris, This should been send Tuesday about 4:00 am Got get out of here my health problem getting worst..."

50. Major Randall conducted an investigation into Ms. Warner's death and generated an Internal Affairs Report. Pertinent Findings of Fact include:

a. Detention staff failed to conduct proper cell checks 9 out of 10 times.

b. Detention sergeant was giving false policy information to the officers.

c. Detention staff failed to follow the emergency health care policy.

d. Corporal Anita Wright failed to follow the Use of Force and Emergency Health Care policy...No employee called for medical assistance during this time.

e. Warner was not evaluated during sick call on November 21, 2017. According to a statement from Corporal Tyroneisha Collins, Doctor Stewart asked Warner twice not to sit down when she entered the clinic. Cpl. Collins also wrote that Dr. Stewart asked Warner if she could speak English because she was not following his instructions. Collins statement says Dr. Stewart sent Warner out of the clinic shortly after that. Nurse Munyan confirmed Warner was not treated by Dr. Stewart on November 21, 2017 because she wouldn't follow his instructions. Also, Nurse Munyan gave the CO a plastic bag because Ms. Warner was nauseous.

51.     I reviewed video camera footage (without sound) of Ms. Warner's cell from approximately 7:00 a.m. on 11/21/2017 through approximately 11:00 a.m. on 11/22/2017 when Ms. Warner was transported by EMS. I also reviewed the hallway camera outside the sick call room on the morning of 11/21/2017. Pertinent findings include:

a. It took approximately 32 minutes for Ms. Warner to get out of bed, get her clothes changed and to leave her cell going to sick call just before 9 a.m. on the morning of 11/21/2017.

b. Ms. Warner was able to walk under her own power slowly to the sick call waiting area but appeared clearly weak with an abnormal gait and posture.

c. Ms. Warner spent 4 minutes off the visit hall camera. During this time she walked from that hallway into the sick call room and had her entire interaction with Dr. Stewart.

d. When Ms. Warner left the sick call area she was walking much more slowly and she was obviously weaker. She leaned against the wall to rest several times and then fell before reaching her housing area. She was dragged back to her cell by several CO's who left her slumped over on the floor.

e. From this time onward, Ms. Warner never stood or sat upright again. She was visibly much less responsive and weaker for the rest of the day.

d. She remained on the floor for the entire afternoon.

e. During the interactions described with the officers shortly before 7:00 p.m. on 11/21/2017 Ms. Warner was noted to be too weak to hold her head or body up. She had some movements of her left arm and leg, but was otherwise completely unresponsive. Multiple CO's surround her, yet they were unable to lift her limp body onto the bed. The CO's left her on the floor and later several female inmates lifted her onto the bed.

e. I noted some movement of Ms. Warner's left arm throughout the night. No security staff are seen on camera entering her room overnight. Movement stops about 7:44 a.m. on the morning of 11/22/2017.

f. No staff is seen entering her cell until a CO and Nurse Munyan enter at 10:20 a.m. on 11/22/2017. They leave her cell at 10:28 a.m. after apparently attempting to check vital signs and glucose.

g. No one enters her cell again until first responders arrive at 10:58 a.m. and begin resuscitation.

**Opinions:** The following are my opinions to a reasonable degree of medical probability on each of these areas based upon my training, experience, and a review of the records in this case.

There are many serious breaches of the standard of care by both the security and medical staff of FCDC regarding the care provided Ms. Warner during her incarceration at FCDC in October - November 2017. Specifically:

1.    Upon intake screening, even though many of the answers to multiple questions are clearly wrong, it is certainly documented that Ms. Warner had physical handicaps and diabetes. In addition, the medical staff had Ms. Warner's medical chart documenting her extensive past medical history and multiple medications. Nevertheless, Ms. Warner was not seen by a nurse or other licensed medical professional for the first two weeks she was incarcerated. MA Dixon should have consulted with a nurse or physician about Ms. Warner's condition upon intake or certainly within the first day after admission. Ms. Warner's glucose should have been checked upon intake. A nurse should have seen Ms. Warner

within a day or so after intake and arrangements should have been made to start her home medications.

2. The Responsible Health Authority and the Responsible Physician have an obligation to have policies and procedures in place that will ensure that persons with serious medical conditions are seen and evaluated by qualified health care staff and treatment for those serious medical conditions is implemented. In addition, it is their responsibility to see that there are no unreasonable barriers to access to health care for inmates.

I have not reviewed all Policies and Procedures of the FCDC but it appears that Nurse Munyan was acting as the Responsible Health Authority or Healthcare Administrator at FCDC and that Dr. Stewart was the Responsible Physician. My opinion based upon a review of the records in this case is that either the policies and procedures in place at the FCDC in November 2017 were woefully inadequate or else the policies were not followed.

I have not reviewed the policies and procedures regarding intake medical screening but either the policy was to let unlicensed medical assistants review the intake screenings done by the security staff and formulate a treatment plan which is below the standard of care, or else a different policy/procedure was not followed.

I have reviewed the "Updated Diabetic Protocol" issued 2/5/2015 by Dr. Stewart and Treatment Protocols on Diabetes/Insulin Shock and

Hyperglycemia/Diabetic Ketoacidosis. These Protocols were not followed in Ms. Warner's case. For example:

a. The Updated Diabetic Protocol says that "All detainees who have been identified as diabetic are to have their blood sugar levels measured by glucometer at 0900 and 1530 every day." Ms. Warner's glucose was not checked at all until 11/16/2017. It was recorded that Ms. Warner refused glucometer checks during the first few days of her incarceration and, in fact, Nurse Grant, was notified of this via kiosk message but did not inquire of Ms. Warner about this or notify the physician. When the nurses did begin checking Ms. Warner's glucose on 11/16/2017 they did not follow the instructions of these protocols on the management of the glucose readings.

b. Both of the Diabetes Protocols require the medical staff to obtain a history about the patient's diabetes and medications. This was not done in Ms. Warner's case. In addition, both of these protocols have items which required them to notify a physician with conditions which Ms. Warner had, yet they did not do so.

Additionally, I have concerns that the fees charged for nursing services and medications at FCDC may have presented an unreasonable barrier to Ms. Warner receiving services based upon her written comments during prior incarcerations.

3. There is no indication in the record that Ms. Warner was seen by a nurse at all until 11/15/2017 on her 17th day of incarceration. This despite evidence that at

least Nurse Grant and Nurse Munyan responded to kiosk medical requests that Ms. Warner was having problems. No licensed medical staff inquired about her medications, reviewed the records available to them, made inquiry of her primary care physician or made any effort to begin treating Ms. Warner.

4.      During these first 17 days of her incarceration without any medical treatment the record shows a clear downward trend in her medical condition and Ms. Warner becoming weaker. Yet the response of even the security staff is shocking. On 11/14/2017, CO Maher documents in a report that it was brought to her attention that Ms. Warner couldn't walk but she "knew better than this." CO Maher then "made it clear that no one was going to pick her up or call 911."

5.      Nurse Grant finally saw Ms. Warner on 11/15/2017. However, her actions on this encounter are below the standard of care for multiple reasons including:

a. Nurse Grant did not check Ms. Warner's vital signs or glucose nor did she document a physical exam.

b. Despite Nurse Grant's knowledge that Ms. Warner had diabetes and that her "Gait was unsteady", she did not inquire about Ms. Warner's medications, did not contact Dr. Fulmer or the pharmacy to verify her medications, did not begin any medications or consult with a provider. Instead, she ordered two creams, planned to re-start the glucose log, planned for Ms. Warner to see Dr. Stewart at

"first available appointment" (this was apparently six days hence on 11/21/2017) and charged Ms. Warner $15.

6. Despite Ms. Warner receiving no medical care for the first 17 days of her incarceration, at least after 11/15/2017 the nursing staff began to provide some care to Ms. Warner. Unfortunately, this care fell below the standard of care for a number of reasons including:

a. The first glucose reading of 442 required the staff to "call physician" according to Dr. Stewart's Updated Diabetic Protocol. Yet there is no indication in the record that this was done by CO Hill. Nor is there even any indication that any insulin was administered or that any treatment or evaluation was provided.

b. On 11/18/2017 Ms. Warner was found to have a glucose reading higher than the limits of the glucose meter. In addition, by this time she was "unstable" and was falling along with significant tachycardia of 125, yet there is no evaluation or treatment provided. Three CO's are present (Coleman, Hill, Haney) yet they do not notify a nurse, call 911, consult Dr. Stewart or take any action. Even CO's without any medical training should be able to recognize this as a potentially serious medical condition, yet they did nothing except write a narrative report.

7. The actions of multiple security staff were far below the standard of care for provision of aid by non-medically trained CO's, including:

a. The actions of CO Maher in item #4 above.

b. The actions of CO's Coleman, Hill and Haney in item #6 above.

c. Sergeant Spivey instructing CO's not to assist Ms. Warner up from the floor of the shower on 11/20/2017.

d. The actions of CO Whitcomb on 11/21/2017. On the videotape, it can clearly be seen that Ms. Warner is completely unresponsive and limp. It is apparent from the video that Ms. Warner is suffering from a serious medical condition, yet neither CO Whitcomb nor any of the other officers present provide any aid to Ms. Warner or summon medical assistance.

e. Corporal Wright attempting to spray Ms. Warner with pepper spray when she was too weak to get up from the floor on 11/21/2017. Corporal Wright's own report of the incident describes Ms. Warner as being unresponsive and motionless with her "head hanging down towards her chest." Nevertheless, when she did not obey "a lawful order to get up and get on her rack" Corporal Wright admitted to attempting to pepper spray Ms. Warner and then instructing the CO's to leave her on the floor. She goes on to describe how she refused to give another inmate who was attempting to help Ms. Warner clean clothes or a diaper and told the inmate that Ms. Warner would have to come to the gate and sign for the items. On the morning of 11/22/2017 when Ms. Warner was near death, Corporal Wright described Ms. Warner's actions as "Detainee Warner refused to come out of the pod and get her breakfast tray."

f. Sgt. Spivey on 11/21/2017 instructing a CO with an ammonia capsule "to put it in her nose." She also instructed CO's not to use a wheelchair or mat to move Ms. Warner because "it was against policy." The CO also reported that Sgt. Spivey instructed them "to hurry up because if the sheriff sees her laying in the day room that we were all going to get in trouble and that we just need to drag her to the cell."

g. CO Coleman documented that on the morning of Ms. Warner's death, she had "called into her room...to see if she would step out to have her blood sugar taken." CO Coleman continues: "I heard no response other than her moaning." Yet CO Coleman did not go in to check on Ms. Warner or attempt to provide her any assistance in a situation that would be obvious even to a lay person that a serious medical condition exists.

8.    Nurse Munyan's actions on the morning of 11/22/2017 are far below the standard of care. When notified by a CO that Ms. Warner was unresponsive and moaning, he did not advise the CO to call 911, check her glucose or provide any other aid. Instead, he waited approximately one and a half hours to come to FCDC. When he arrived, it would have been obvious on first glance that Ms. Warner was in extremis. Nevertheless, he did not immediately call an ambulance. Instead, according to his documentation, he spent approximately 20 minutes attempting to get vital signs and then another 20 minutes getting permission from Dr. Stewart to

send Ms. Warner to the ED. Only after being at the jail for approximately 40 minutes did he finally call 911.

On the video Nurse Munyan can be seen spending eight minutes in Ms. Warner's cell with a CO. Nurse Munyan only had very brief physical contact with Ms. Warner during this time and does not appear to render any type of medical treatment or assessment except vital signs. He then left Ms. Warner alone for approximately 30 minutes until first responders arrived to find Ms. Warner in cardiac arrest.

9.     In addition to the breaches of the standard of care by the nurses and security staff at FCDC, Dr. Stewart's actions are among the most concerning. His actions completely fail to meet the standard of care. Specifically:

a. As the responsible physician, it was Dr. Stewart's responsibility to see that detainees are medically screened by qualified personnel upon intake, that potentially serious medical conditions are addressed and that chronic conditions are treated. This did not occur in Ms. Warner's case.

b. It is clear from his own documentation and that of the other personnel on duty the morning of 11/21/2017 that his evaluation of Ms. Warner was cursory and ineffectual at best. Dr. Stewart came to the conclusion that Ms. Warner was "acting out" and "acts as if she can't walk or help self." This erroneous conclusion proved fatal to Ms. Warner.

c. It is my opinion that the finding of an entirely normal nine-system physical exam recorded by Dr. Stewart on 11/21/2017 could not have been present on that day. We have multiple other descriptions of Ms. Warner's condition and vital signs from around that same time period that are inconsistent with these exam findings. In addition, the autopsy findings are entirely inconsistent with a normal abdominal exam less than 24 hours before her cardiac arrest.

d. The statements of multiple officers and Nurse Munyan, along with findings of the Internal Affairs Report, contradict Dr. Stewart's documentation that he conducted a complete physical examination of Ms. Warner during sick call on 11/21/2017.

10.   Ms. Warner died of septic shock due to a ruptured appendix.

a. The autopsy findings are consistent with appendicitis which developed and was present for an extended period of time (multiple days to a few weeks) before rupture. This was followed by rupture of the appendix with resulting peritonitis which occurred some period of time (hours to a few days) before her cardiac arrest on the morning of 11/22/2017. This condition would have caused significant symptoms and physical exam findings. Ms. Warner's clinical course is consistent with this pathologic process.

b. This was also complicated on presentation at the ED by diabetic ketoacidosis which had not been recognized or treated at FCDC.

c. More likely than not, Ms. Warner would have been successfully treated for her appendicitis and DKA up until shortly before her cardiac arrest on the morning of 11/22/2017. After rupture of the appendix, her condition became much more serious, but even then she would likely have survived had she been sent to the hospital before she suffered cardiac arrest due to septic shock. Certainly at the time of Dr. Stewart's visit on 11/21/2017 had Ms. Warner been sent to the hospital, she would likely have been successfully treated and would have survived.

11.     These breaches of the standard of care led directly to Ms. Warner's development of hyperglycemia and DKA which went essentially untreated and the failure to recognize appendicitis until her appendix ruptured. These conditions would certainly have led to symptoms which could have been detected with adequate evaluations. As a direct result of the failure to diagnose and treat these serious medical conditions, Ms. Warner died.

12.     The actions of each of the personnel named, both individually and collectively, are shocking in their lack of concern for the possibility that Ms. Warner was suffering from a serious medical condition. The clinical deterioration of Ms. Warner is evident in the record and yet each of the personnel appear to have convinced themselves and each other that Ms. Warner was deliberately being non-compliant or feigning her symptoms. They then ignore signs that should have been

obvious even to non-medically trained persons that Ms. Warner was having serious problems and instead appear callously indifferent to her.

Although I certainly understand that it is not the job of correctional healthcare experts to decide what is or is not deliberate indifference, this would appear to me to be a clear example of the lack of care that rises to that level of deviation from the standard of care.

13. My opinion is that no reasonable correctional healthcare expert would be able to come to the conclusion that the care delivered by the security staff, nursing staff or Dr. Stewart was even close to the standard of care required in this case.

14. I have been retained in several cases in which criminal charges have been brought against one or more of the personnel responsible for providing care to an inmate. In the majority of those cases, the actions were not as egregious as those in this case.

These opinions are expressed as requested to a reasonable degree of medical probability or likelihood. I reserve the right to review additional materials as noted or as they become available and to amend or modify these opinions based on the review of additional materials.

To assist me in forming these medical opinions I have reviewed records in this case, including:

1. FCDC Medical File and Kiosk Records

2. FCDC Booking file and Arrest Report

3. Primary Care Physician Records

4. Baptist-Conway Records

5. MEMS Report

6. Medical Examiner Report

7. Internal Affairs Report

8. Jail Protocols on Diabetes, Urination, Vaginal Discharge & Yeast Infections

9. Wheelchair Policy E-mail

10. Emergency Insulin Log

11. Officer Statements

12. Inmate Statements

13. Nursing Staff Statements

14. Inmate Meal Log Sheet & Recreation Log

15. Male & Female Housing Passdown

16. Letter from Ms. Warner to family

17. Video from FCDC

I have also requested the following documents which I have not yet received:

1.    All Policies & Procedures for medical care at FCDC

2.    Job descriptions and personnel files of the nursing and medical staff

3.    Mortality review documents prepared by the FCDC or medical staff

My current curriculum vitae is attached.

X _Thomas D. Fowlkes, M.D._
Thomas D. Fowlkes, M.D.



# Thomas D. Fowlkes, M.D.

1207 Office Park Drive, Suite B
P.O. Box 1955
Oxford, MS 38655
Cell: 662-801-7508
tom@drfowlkes.com

## SUMMARY OF QUALIFICATIONS

Seasoned Physician Board Certified in both Emergency Medicine and Addiction Medicine and with more than 19 years of practice in Correctional Medicine.

Accomplished expert witness with more than 10 years of experience at both deposition and trial in state and federal courts and before state regulatory bodies on behalf of plaintiffs/prosecutors/state boards as well as defendants in these matters.

Areas of expertise include:    Correctional Healthcare
Deaths in Custody
Drug Abuse and Effects of Addiction
Drug testing interpretation and effects of substances
Urgent Care & Emergency Medicine

## CERTIFICATIONS

Board certified emergency physician (American Board of Emergency Medicine)- July 1993 - Dec. 2023

Board certified in Addiction Medicine (American Board of Addiction Medicine)- Dec. 2010 - Dec. 2020

Certified Correctional Healthcare Professional - Physician (CCHP-P) - July 2017 - June 2018

Certified Medical Review Officer for Drug/Alcohol Testing (MROCC) - Dec. 2012 - Dec. 2022

Unrestricted license to practice medicine in Mississippi since 1993

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2015- Present | Director of Professional & Medical Relations/Addiction Physician for American Addiction Centers, a nationwide provider of addiction services, at Oxford Treatment Center (formerly The Oxford Centre) |
| 1998-Present | Medical Director at Lafayette County (MS) Detention Center, a 140-bed jail facility holding local and federal (US Marshal) detainees. From 1998-2015, as an independent contractor responsible for provision of all medical, nursing, medication and lab services at the facility. Responsible for all these health services as an employee of Lafayette County, MS since 2015 |
| 2011- Present | Medical consultant for Third Circuit Judicial District Drug Court, a felony drug court in Oxford, MS under the direction of Administrator Brandon Vance and Judge Andrew Howorth |
| 2007- Present | Prisoner Advocate Member, Institutional Review Board, Division of Research Integrity & Compliance, University of Mississippi |

## PROFESSIONAL EXPERIENCE (cont.)

| | |
|---|---|
| 1992-Present | Sole shareholder of Thomas D. Fowlkes, M.D., P.A. Contractor of emergency physician services to acute care facilities and emergency medicine/EMS consultant. Operated correctional medical facility at Lafayette County, MS Detention Center and conducted court ordered mental health, substance abuse & competency evaluations for Chancery Court in Lafayette County. Expert witness & litigation support practice |
| 1999-Present | Served as Deputy Medical Examiner Investigator for Lafayette County MS from 1999-2008 after completing 40-hour Death Investigation Certification Class. Since 2008 I have served as the medical consultant to the Lafayette County Coroner. |
| 2009- 2017 | Owner of a primary care clinic in Oxford, MS. Provider of primary and urgent care and an office-based addiction medicine practice. Until 2015, I practiced as a solo-practitioner then in partnership with a nurse practitioner as Oxford Family Clinic, LLC |
| 2011- 2015 | Co-owner and Chief Medical Officer of The Oxford Centre, Inc. a 76-bed CARF accredited detox, residential and outpatient substance abuse treatment facility. Sold to American Addiction Centers, a publicly traded company, in August 2015 |
| 2011-Present | Medical Director for A&D Services for Region IV Comm. Mental Health Center. 2011-2014 Detox Services at Tupelo CSU. 2017-Present at Corinth (Part-time) |
| 2008-2011 | Addiction physician for detox and residential unit at Haven House, substance abuse treatment facility in Oxford, MS operated by Region II CMHC (Part-time) |
| 2005-2009 | Urgent care physician at Robinsonville (MS) Urgent Care Clinic and part-time physician at the Harrah's Employee Health & Wellness Center |
| 1998-2001 | Private practice of Emergency Medicine with Oxford Emergency Group, P.A. Provided emergency physician services to Baptist Memorial Hospital-North Miss. and Tri-Lakes Medical Center |
| 1997-1998 | Chief Medical Officer for Rural-Metro Corporation's Mid-South region. Rural-Metro provides ambulance services and fire protection throughout the United States and internationally. |
| 1995-1997 | Chief Medical Officer, secretary/treasurer and co-owner of Priority EMS, an ambulance provider in north Mississippi and metropolitan Memphis. Corporation merged with Rural-Metro Corp., a publicly traded company |
| 1992-1994 | Private practice of Emergency Medicine as shareholder and officer in Mid-South Emergency Physicians, P.C. Provided emergency department services for St. Joseph Hospital in Memphis, TN |

## EDUCATION

University of Pittsburgh Residency in Emergency Medicine
Pittsburgh, PA
1989-1992
Selected Chief Resident-1992
Served as medical command & on-scene physician for City of Pittsburgh, Dept. of Public Safety
Served as flight physician for STAT Med-evac helicopter program

## EDUCATION (cont.)

University of Tennessee Medical School
Memphis, TN
M.D. 1989
Faculty Medal for Highest GPA
Alpha Omega Alpha Medical Honor Society

Rhodes College
Memphis, TN
B.S. in Psychobiology 1985
EMT with Shelby County Sheriff's Department, Division of Emergency Services
Psychiatric Technician at Memphis Mental Health Institute, an acute care psychiatric hospital

University of the South
Sewanee, TN
1980-1982
Community Volunteer Firefighter
Emergency Medical Technician (EMT-A)

## CURRENT MEMBERSHIPS/RECOGNITIONS

American College of Correctional Physicians
Fellow of the American Society of Addiction Medicine
Mississippi Society of Addiction Medicine
North Mississippi Medical Society/Mississippi State Medical Association/American Medical Association

## PUBLICATIONS

Fowlkes T. "Shortness of Breath." *Prehospital Systems and Medical Oversight.* 3rd ed. Ed. Kuehl A. Dubuque: Kendall/Hunt, 2002. 665-671. Print.

Fowlkes T. "Shortness of Breath." *Prehospital Medicine: The Art of On-Line Medical Command.* 1st ed. Eds. Paris, Roth, Verdile. Maryland Heights: Elsevier, 1996. 101-112. Print.

Fowlkes T, Verdile V. "Managing Gunshot Wounds." *The Journal of Emergency Services.* Vol. 23 (1990): 20-27. Print.

## PRESENTATIONS

"Safe Prescribing of Sedative-Hypnotics" at *MPHP Prescribers' Summit: Controlled Substance Update* April 13, 2018, Gulfport, MS

"Safe Prescribing of Sedative-Hypnotics" at *MPHP Prescribers' Summit: Controlled Substance Update* March 9, 2018, Oxford, MS

"Case Studies in Controlled Substance Prescribing" at *MPHP Prescribers' Summit: Controlled Substance Update* October 13, 2017, Jackson, MS

"Case Studies in Controlled Substance Prescribing" at *Mississippi State Medical Association Foundation Prescribers' Summit* March 31, 2017, Oxford, MS

"Update on the Prescription Drug Epidemic, Disturbing New Trends & Drug Testing Basics" at *Lafayette County Bar Association's Continuing Legal Education Conference* October 20, 2016, Oxford, MS

## PRESENTATIONS (cont.)

" Benzodiazepines: An Update" at *North Mississippi Medical Center's 13th Annual Outcomes Conference* August 25, 2016, Pickwick, TN

"Sedative Hypnotics: Avoiding Prescribing Pitfalls" at *Mississippi Professionals Health Program Prescribers' Summit* June 24, 2016, Gulfport, MS

" Benzodiazepines: Update on Prescribing Trends" at *Mississippi State Medical Association Foundation Prescribers' Summit* April 1, 2016, Oxford, MS

"An Introduction to the Prescription Drug Epidemic", Guest lecturer, *Addiction Counseling Course in the Graduate School of Counselor Education, University of MS*, February 22, 2016, Oxford, MS

"Benzodiazepines: An Update" at *37th Annual Caduceus Retreat & Conference of MS State Medical Association Foundation*, July 11, 2015, Louisville, MS

"An Introduction to the Prescription Drug Epidemic", Guest lecturer, *Addiction Counseling Course in the Graduate School of Counselor Education, University of MS*, February 10, 2015, Oxford, MS

"Prescription Drug Epidemic: Trouble at Home" at *Annual FACT Conference*, November 7, 2014, Tupelo, MS

"Mental Health in the Primary Care Setting" Keynote Address at *North MS Medical Center Outcomes Conference*, August 22, 2014, Pickwick, TN

"Managing Opiate Addicts with Painful Conditions" at *North MS Medical Center Outcomes Conference*, August 21, 2014, Pickwick, TN

"Buprenorphine: The Rest of the Story" at *24th Annual MS Association of Addiction Professionals Conference*, July 22, 2014, Oxford, MS

"Prescription Drug Epidemic: Trouble at Home" at *24th Annual MS Association of Addiction Professionals Conference*, July 22, 2014, Oxford, MS

"Controlled Substance Update" at *MS State Medical Association Foundation Prescribers' Summit*, March 28, 2014, Oxford, MS

"Benzodiazepines: The Good News & Bad News" at *Northwest MS Regional Medical Center Staff Conference*, Dec. 10, 2013, Clarksdale, MS

"Benzodiazepine Update" at *Southern Medical Association Rules, Regulations, & Risks of Prescribing Controlled Substances,* November 15, 2013, Hattiesburg, MS

"Controlled Substances Update: Benzodiazepines" at *Singing River Health System Prescribers' Summit*, November 1, 2013, Moss Point, MS

"Controlled Substances Update: Benzodiazepines" at *MS Professionals Health Program Prescribers Summit*, October 18, 2013, Jackson, MS

"Managing Controlled Substances in MS: Benzodiazepines" at *North MS Medical Center Best Outcomes Conference*, August 22, 2013, Pickwick, TN

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

CHRISTINE TURNER, SPECIAL
ADMINISTRATOR OF THE ESTATE
OF LINDA WARNER, Deceased                                    PLAINTIFF

v.                                        No. 4:18-cv-468-DPM

GARRY STEWART, M.D.;                                          DEFENDANT

## EXHIBIT C

1           IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF ARKANSAS
2                 LITTLE ROCK DIVISION

3

4  CHRISTINE TURNER, SPECIAL ADMINISTRATOR OF
   THE ESTATE OF LINDA WARNER, deceased      PLAINTIFF

5

6  VS.              CASE NO. 4:18-cv-468-DPM

7

8  FAULKNER COUNTY, ARKANSAS;
   CHRIS REIDMUELLER; TIM RYALS;
9  BOBBY SPIVEY; ANITA WRIGHT;
   MICHELLE MAHER; TERESA COLEMAN;
10 MARIA HILL; TAYLOR HANEY; ERIC
   WHITCOMB; MARISSA PARKS;
11 KATIE MARTIN; ANNA POPE;
   CHRISTOPHER LISEMBEY-HALL;
12 THAD KILPATRICK; TYRONEISHA
   COLLINS; MALIK CLEMONS; CALENE
13 SCOTT; TANEISHA JERNIGAN; LEANNE
   DIXON; GARRY STEWART, M.D.; KAREN D.
14 GRANT, LPN; MONTE J. MUNYAN, LPN;
   JANE AND JOHN DOES 1-X               DEFENDANTS
15

16

17        ORAL DEPOSITION (VIA VIDEOCONFERENCE)

18                        OF

19              STEPHEN ERICKSON, MD

20                    VOLUME II

21

22      Taken September 18th, 2020, at 1:40 p.m.

23

24

25

1   well as the gas developing in her intestinal

2   viscera.  When you have an acute abdomen and you're

3   alive, they'll often describe it as rock-hard and

4   tense, that's a different kind of tenseness.  That's

5   muscles contracting and causing that, but when I see

6   a distinctly bloated abdomen that's tense, I'm

7   thinking either there's fluid in there or there's

8   too much air in there or something is causing that.

9   Most the time in a death, we feel the abdomen or we

10  palpate the abdomen and it's relatively soft and not

11  protuberant.

12  **Q    And so, was Ms. Warner having an acute abdomen**

13  **before her death?**

14  A    Yes, what she had would be defined by a surgeon

15  or an internal medicine doctor as an acute abdomen.

16  **Q    And you would need to examine her abdomen in**

17  **order to determine that it was acute?**

18  A    Well, you need to do a very detailed exam to

19  diagnose the acute abdomen.  That's a specialty that

20  takes a lot of education, training, and experience

21  to do, but, yes, an acute abdomen to diagnose it

22  takes a well-practiced and experienced hand.

23  Because you can get an acute abdomen from multiple

24  different things, from the gallbladder down to the

25  genital system, in a female, the ovaries, the

1  don't know her exact vital signs, but some people

2  may have even said that she was in that end stage of

3  septic shock at that point in time.

4  Q    So I want to go through a timeline, but I want

5  to go backwards and just make sure it coincides with

6  your findings on the autopsy.

7  A    Okay.

8  Q    At 8:27 a.m. on November 23rd, 2017, Ms. Warner

9  was pronounced dead.  Is that consistent with your

10  record?

11  A    Let me make sure.  Well, you know, these

12  records they give you for these, they don't let me

13  get on the computer and look at the investigation.

14  So I'll just have to go with my summary, so I don't

15  have the -- I'll just have to trust what you're

16  saying there because my specific timeline is not

17  included in the records that I got -- oh, yes, here

18  it is.  Okay, she was declared dead at 8:27 on

19  11/23, that's correct.

20  Q    Okay.  And according to the medical records,

21  she arrived at Conway Baptist at 11:43 a.m. on

22  November 22nd, 2017, which was about 21 hours

23  before her death.  Would that be consistent with

24  your findings?

25  A    Yes, I believe I've made that statement in my

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

CHRISTINE TURNER, SPECIAL
ADMINISTRATOR OF THE ESTATE
OF LINDA WARNER, Deceased                                    PLAINTIFF

v.                              No. 4:18-cv-468-DPM

GARRY STEWART, M.D.;                                          DEFENDANT

## EXHIBIT D

Tel:      501-374-6300
Toll Free: 1-800-726-6300
Fax #1:   501-374-1244
Fax #2:   501-907-0661
www.petermillerlaw.com

# Law Offices of
# Peter Miller, P.A.

1601 Broadway
Little Rock, AR 72206
petermillerlaw.com

February 12, 2021

Reece, Moore, McNeill, Pendergraft
Attn: Paul McNeill and Dustin Darst
710 Windover Road, Ste. B
Jonesboro, AR 72401

**RE: Warner v. Stewart**

Dear Paul and Dustin,

I have no objections to the parts you have designated for Monte Munyan's deposition. I would like to add the following specific designations:

| PAGE | LINE |
|------|------|
| 15 | 23-25 |
| 16 | 1 |
| 17 | 1-5 |
| 20 | 6-20 |
| 25 | 19-25 |
| 26 | 1-20 |
| 36 | 16-21 |
| 38 | 16-19 |
| 39 | 10-25 |
| 40 | 1-3, 5 |
| 41 | 7-9 |
| 42 | 12-25 |
| 43 | 1 |
| 53 | 4-6, 8-25 |
| 56 | 1-10 |
| 57 | 9-25 |
| 58 | All |
| 59 | 1-18 |
| 60 | All |
| 61 | 1-22 |
| 62 | 18-25 |
| 63 | 9-25 |
| 64 | 1, 4-25 |

**Peter Miller** *Attorney at Law* **Jessica Virden** *Attorney at Law* **Paige Edgin** *Attorney at Law*
**B. Chase Mangiapane** *Attorney at Law* **Nader Afsordeh** *Attorney at Law* **Edward Zellmer** *Attorney at Law*

| | |
|---|---|
| 65 | 1-5, 7-10 |
| 67 | 20-25 |
| 68 | 1-18, 20-25 |
| 69 | 1-3, 25 |
| 70 | All |
| 79 | 6-25 |
| 80 | 17-20 |
| 81 | 1-12, 21-25 |
| 82 | 5-7, 20 |
| 83 | 21-25 |
| 85 | 11-14, 16-25 |
| 86 | All |
| 87 | 1, 24-25 |
| 88 | 1-8 |
| 89 | 14-25 |
| 90 | 1 |
| 91 | 2-5, 7-12 |
| 92 | 10-11, 14-15, 17, 24-25 |
| 93 | 1-6 |
| 95 | 1-16 |
| 101 | 21-25 |
| 103 | 4-25 |
| 104 | 1-17, 20-25 |
| 105 | 1-15, 19-25 |
| 106 | 1 |

Additionally, in an effort to stream line the trial, here are the specific pages and lines I will present from my other deposition designations if the witness is not available live:

From Captain Chris Riedmueller:

| PAGE | LINE |
|---|---|
| 5 | 23-25 |
| 6 | 1-7 |
| 8 | 11-18 |
| 9 | 9-21 |
| 10 | 10-14 |
| 11 | 5-8, 23-25 |
| 12 | All |
| 13 | 1-12 |
| 16 | 3-25 |
| 17 | 1-6 |
| 26 | 4-7, 13-25 |
| 31 | 9-25 |
| 32 | All |
| 33 | All |

| | |
|---|---|
| 34 | 1-24 |
| 36 | 24-25 |
| 51 | 20-25 |
| 52 | 1-18 |
| 61 | 7-25 |
| 62 | 1-16 |
| 63 | 23-25 |
| 64 | 24-25 |
| 65 | All |
| 66 | All |
| 67 | All |
| 68 | All |
| 70 | 25 |
| 71 | All |
| 72 | All |
| 73 | 1-14 |
| 75 | 13-25 |
| 76 | 1-22 |
| 78 | All |
| 79 | All |
| 80 | All |
| 81 | 1 |
| 83 | 23-25 |
| 84 | All |
| 85 | 1-23 |
| 90 | 4-7 |
| 99 | 20-25 |
| 100 | 1-20 |
| 101 | All |
| 102 | All |
| 103 | 1-16 |
| 104 | 10-12 |
| 106 | 10-18 |
| 107 | 15-25 |
| 108 | 1-6 |

Officer Bobbi Spivey:

| **PAGE** | **LINE** |
|---|---|
| 6 | 21-25 |
| 7 | 1-13 |
| 11 | 12-24 |
| 33 | 15-25 |
| 34 | 1-3 |
| 35 | All |
| 38 | 4-25 |
| 39 | 1, 8-25 |

| | |
|---|---|
| 40 | All |
| 41 | All |
| 42 | All |
| 43 | All |
| 44 | All |
| 45 | 6-25 |
| 46 | All |
| 47 | 1-6 |

Major John Randall:

| **PAGE** | **LINE** |
|---|---|
| 5 | 24-25 |
| 6 | 1-12 |
| 8 | 14-25 |
| 9 | 1-3 |
| 27 | 2-25 |
| 29 | 17-25 |
| 30 | 2-5 |
| 31 | 2-7 |
| 33 | 7-12, 19-25 |
| 34 | 1-4 |
| 35 | 15-25 |
| 36 | All |
| 37 | All |
| 38 | All |
| 39 | 1-23 |
| 40 | All |
| 41 | 1-7 |
| 42 | 8-20 |
| 50 | 10-17 |
| 60 | 22-25 |
| 61 | 1-11 |
| 72 | 12-25 |
| 77 | 25 |
| 78 | All |
| 79 | All |
| 80 | 1-16 |
| 85 | 5-25 |
| 86 | 1-8 |

Leanne Dixon:

| **PAGE** | **LINE** |
|---|---|
| 5 | 19-25 |
| 6 | 3-5 |
| 10 | 6-25 |

| | |
|---|---|
| 11 | All |
| 12 | 1-10 |
| 14 | 2-20 |
| 16 | 5-25 |
| 20 | 21-25 |
| 21 | 1-12 |
| 23 | 19-25 |
| 24 | All |
| 25 | All |
| 26 | All |
| 27 | All |
| 28 | All |
| 29 | 1-15 |
| 31 | 3-25 |
| 32 | All |
| 33 | All |
| 34 | All |
| 35 | All |
| 36 | All |
| 37 | All |
| 38 | All |
| 39 | All |
| 40 | 1-14 |

Dr. Stephen Erickson

| **PAGE** | **LINE** |
|---|---|
| 6 | 3-12 |
| 7 | 24-25 |
| 8 | All |
| 9 | All |
| 10 | All |
| 11 | All |
| 12 | All |
| 13 | All |
| 14 | All |
| 15 | 1-16 |
| 18 | 8-25 |
| 19 | All |
| 20 | All |
| 21 | All |
| 22 | All |
| 23 | All |
| 24 | All |
| 25 | 1-11 |
| 26 | 21-25 |
| 27 | All |

| | |
|---|---|
| 28 | 1-10 |
| 29 | 18-25 |
| 30 | 1-18 |
| 31 | 14-25 |
| 32 | All |
| 33 | All |
| 34 | All |
| 35 | 1-20 |
| 38 | 5-8 |
| 39 | All |
| 40 | 1-23 |
| 41 | 1-2, 18-25 |
| 42 | All |
| 43 | All |
| 44 | All |
| 45 | 21-25 |
| 46 | All |
| 47 | 1-7 |
| 55 | 17-25 |
| 56 | All |
| 57 | All |
| 58 | All |
| 59 | All |
| 60 | All |
| 61 | All |
| 62 | All |
| 63 | All |
| 64 | All |
| 65 | All |
| 66 | All |
| 67 | All |
| 68 | All |
| 69 | All |
| 70 | All |
| 71 | All |
| 72 | All |
| 73 | All |
| 74 | All |
| 75 | All |
| 76 | All |
| 77 | All |
| 78 | All |
| 79 | 1-18 |
| 81 | 10-25 |
| 82 | 1 |
| 84 | 9-25 |
| 85 | All |

| | |
|---|---|
| 86 | 1-7 |
| 87 | 22-25 |
| 88 | 1-6 |

Sheriff Tim Ryals:

| PAGE | LINE |
|---|---|
| 5 | 19-25 |
| 6 | 7-8 |
| 7 | 6-14 |
| 9 | 14-25 |
| 10 | All |
| 11 | 1-4 |
| 12 | 5-18 |
| 24 | 8-25 |
| 25 | 1-7 |
| 52 | 4-12 |
| 54 | 8-25 |
| 55 | All |
| 56 | All |
| 57 | All |
| 58 | All |
| 59 | All |
| 60 | 1-16, 22-25 |
| 61 | All |
| 62 | 1-6 |
| 63 | 21-25 |
| 64 | 1-8 |
| 66 | 13-25 |
| 67 | 1-22 |
| 73 | 18-22 |
| 87 | 8-12 |
| 88 | 21-24 |
| 89 | 8-18 |

Officer Tyroneisha Collins:

| PAGE | LINE |
|---|---|
| 5 | 21-25 |
| 6 | 7-11 |
| 7 | 17-25 |
| 8 | 1 |
| 10 | 5-22 |
| 35 | 18-25 |
| 36 | All |
| 37 | 1-6 |
| 41 | 4-25 |

| PAGE | LINE |
|------|------|
| 42 | 1-10 |
| 43 | All |
| 44 | All |
| 45 | All |
| 46 | All |
| 47 | All |
| 48 | All |
| 49 | 1-2 |
| 51 | 4-25 |
| 52 | All |
| 53 | 1-19 |

Officer Maria Hill:

| PAGE | LINE |
|------|------|
| 5 | 21-25 |
| 6 | 1-11 |
| 8 | 3-10 |
| 11 | 6-9, 17-25 |
| 12 | All |
| 13 | All |
| 14 | All |
| 15 | All |
| 16 | All |
| 17 | All |
| 18 | All |
| 19 | 1-14 |

I plan on subpoenaing all but Monte Munyan to testify live at trial. However, should someone ignore the subpoena, I will use the above outlined deposition parts. I hope to only have to use Nurse Munyan's. If you have any objection to these lines, let me know so we can get everything worked out before March 8.

Sincerely,

Jessica Virden Mallett
Attorney at Law

/jav